IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JASON HAGUE, Special Administrator of the Estate of Jeffrey K. Hague, Deceased;<br><br>Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation;<br><br>Defendant. | **8:20CV473**<br><br>**MEMORANDUM AND ORDER** |

Plaintiff Jason Hague ("Plaintiff") has moved for an order compelling Defendant Union Pacific Railroad Company ("UP") to produce video footage of the scene of the subject accident, a document entitled "Derailment Cause Finding Prevention Book," and the transcripts of certain witness statements, (Filing No. 33).

BACKGROUND

On December 30, 2018, Jeffrey Hague, an employee of UP, was "performing a railroad maneuver in which Mr. Hague's train was being operated in reverse" which resulted in a derailment and "Mr. Hague being pinned against other rail equipment and crushed, resulting in massive bodily injuries and his death." (Filing No. 33 at CM/ECF p. 2). This lawsuit was filed by Jason Hague – the personal representative of decedent Jeffrey Hague's estate – pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§51-60.

On January 4, 2021, the court set certain discovery and progression deadlines in this case, and the exchange of discovery material began thereafter.

(Filing No. 15). During the course of discovery, a dispute arose between the parties related to production of certain materials by UP. Plaintiff claims UP is improperly withholding video evidence of the subject accident and a document entitled "Derailment Cause Finding Prevention Book" (hereafter "Derailment Manual"). (Filing No. 33 at CM/ECF p. 4). UP does not explicitly dispute the relevancy of the foregoing materials but has objected to production prior to entry of a protective order limiting Plaintiff's use of that discovery outside this lawsuit.[1] (Filing No. 40 at CM/ECF p. 7). Plaintiff believes that a protective order is unnecessary but Plaintiff "in an offer of good faith… would be willing to agree to a limited protective order." (Filing No. 33 at CM/ECF p. 5). However, Plaintiff and UP were unable to come to an agreement on the protective order's scope.

Plaintiff also requests an order compelling UP to produce the recorded statement transcripts of Chris Johnson and Darin Wolfrum. Plaintiff claims that UP's assertion of work-product privilege is improper and that the court should compel production over Plaintiff's work-product objection. (Filing No. 33 at CM/ECF p. 3). UP claims that both statements were taken in anticipation of litigation and are protected from disclosure under Fed. R. Civ. P. 26(b)(3)(A).

After several informal attempts to resolve these issues, the parties were unsuccessful. Counsel contacted the court to set a discovery dispute conference before the undersigned magistrate judge, and that conference was held on April 26, 2021. No resolution was reached during the call, and the court set a deadline and briefing schedule for litigation of this dispute on a formal motion.[2] (Filing No. 31) (text order).

---

[1] The court does not devote any of its analysis to the relevancy of this information. To the extent there is any dispute, the court affirmatively finds that the discovery at issue is relevant within the meaning of Rule 26.

[2] During the discovery conference with the undersigned, Plaintiff did not raise the dispute related to the Derailment Manual. However, UP agrees the court should nonetheless adjudicate the protected status of

Plaintiff timely filed his discovery motion, which is now fully submitted. Being fully advised, the court finds as follows.

ANALYSIS

I. Videos and Derailment Manual

a. Procedural Posture

The court will briefly address Plaintiff's contention that UP has waived its right to seek a protective order in this case. Plaintiff argues that UP should have been the moving party if it wished to obtain a protective order and that UP should be disallowed from seeking a protective order in response to Plaintiff's motion to compel. (Filing No. 33 at CM/ECF p. 9) ("any argument from Defendant that it should now be entitled, as a response to Plaintiff's motion, be allowed to move the court for a protective order should be rejected as untimely, made in bad faith, and against the interests of justice"). The court is not persuaded by this argument.

After a breakdown in the parties' informal discussions to resolve this dispute, they contacted the court and participated the required discovery dispute conference prior to any formal motion practice. During that conference, the court was expressly advised that the dispute between the parties was the scope of any necessary protective order. The court directed Plaintiff to file a motion to compel, with Defendant proffering a response. (Filing No. 31) ("After conferring with counsel, Plaintiff's anticipated motion to compel shall be filed on or before May 3,

---

the Derailment Manual in this pending Motion, arguing the manual and the videos should be subject to the same protective order provisions. (Filing No. 40 at CM/ECF p. 2, n. 2). Given the foregoing, and in the interest of judicial economy, the court will address the Derailment Manual on the current motion without the need for an additional conference.

2021; Defendant's response shall be filed on or before May 14, 2021; and Plaintiff's reply, if any, shall be filed on or before May 19, 2021.") (text order). Perhaps the court could have directed Defendant to file a motion for protective order with Plaintiff filing a response. However, based on the series of events leading up to the instant motion, and the relief requested, there would have been no substantive difference. And given the back and forth between the parties, and what appears to have been good faith efforts to resolve this issue without judicial involvement, the court declines to find that UP acted in bad faith or was improperly dilatory in seeking this relief. As noted above, the court has broad discretion when fashioning protective orders and it is well within the authority of the court to enter such an order in these circumstances.

     b.    Merits

This case implicates an interesting, threshold question: How broadly may a party use the information it obtains during civil discovery? Many jurisdictions have addressed that question, finding dissemination of pretrial discovery materials by the receiving party "is not prohibited absent a protective order." DaCosta v. City of Danbury, 298 F.R.D. 37, 39 (D.Conn.2014); see also Kent v. The New York State Pub. Emps. Fed'n, AFL-CIO, 2019 WL 457544, at *1 (N.D.N.Y. Feb. 5, 2019) ("[i]n the absence of such a protective order, 'parties to a law suit [sic] may disseminate materials obtained during discovery as they see fit"); Calhoun v. City of Chicago, 273 F.R.D. 421, 422 (N.D. Ill. 2011) ("Unless prohibited by a protective order, a party can disseminate materials obtained in discovery.") (citation omitted).

However, while the rules themselves do not limit a party's use of the materials it obtains in discovery, such dissemination "for non-judicial purposes is unusual and rightly so." DaCosta, 298 F.R.D. at 39. The discovery process exists "for the sole purpose of assisting in the preparation and trial, or the settlement, of

4

litigated disputes." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984); see also United States v. Smith, 985 F. Supp. 2d 506, 521 (S.D.N.Y. 2013) ("these rules are meant to foster the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public").

> [V]irtually all [members of the public] have an interest in ensuring that everyone in our society ha[s] access to a fair and impartial judicial system without having to pay too high a price of admission in the form of the surrender of personal privacy. Thus, courts must be vigilant to ensure that their processes are not used improperly for purposes unrelated to their role.

Springs v. Ally Fin., Inc., 2014 WL 7778947, at *5 (W.D.N.C. Dec. 2, 2014), aff'd, 2015 WL 506471 (W.D.N.C. Feb. 6, 2015), order vacated in part on other grounds, 657 F. App'x 148 (4th Cir. 2016) (citation omitted).

On the instant motion, Plaintiff argues that no protective order is necessary, but he agrees to a limited protective order that prohibits "making the evidence freely available on the internet or using it in any advertisement." (Filing No. 33 at CM/ECF p. 2). UP agrees to such restrictions, but requests that the following additional terms be included in the protective order: (1) that the parties and their agents will not distribute the items to anyone outside their offices except for consultants or testifying experts they have retained; (2) that, at the conclusion of this litigation, all copies be reclaimed and either destroyed or returned to UP; and (3) that the subject items cannot be used in future litigation. (Filing No. 40 at CM/ECF p. 10).

Plaintiff will not agree to those additional terms. Thus, the central dispute in this case is related to the scope of use Plaintiff may make of discovered materials.

Under Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...[.]" Fed. R. Civ. P. 26(c). The moving party bears the burden to demonstrate good cause for the issuance of the protective order. Prism Techs. LLC v. AT&T Mobility, LLC, 2014 WL 3670949, at *1 (D. Neb. July 23, 2014) (citations omitted). For good cause to exist, "the parties seeking protection must show that specific prejudice or harm will result if no protective order is granted." Vishay Dale Electrs., Inc. v. Cyntec Co., Ltd., 2008 WL 4372765, *3 (D. Neb. Sept. 22, 2008) (citation omitted). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." Seattle Times Co., 467 U.S. at 36.

UP asserts it has a security interest in keeping the location and field-of-view of its camera footage confidential because "nefarious actors" could use that information to interfere in UP operations. (Filing No. 40 at CM/ECF p. 8). UP argues that surveillance footage is by its very nature "sensitive and confidential." (Filing No. 40 at CM/ECF p. 7). UP points the court to cases holding that disclosure of the location and vantage point of private security cameras could lead to "theft," "undesirable acts," and "security and financial concerns." (Filing No. 40 at CM/ECF p. 8). UP posits that a bad actor could also use information related to its camera locations to piece together "sensitive information about Union Pacific's rolling stock." (Filing No. 40 at CM/ECF p. 8).

As to the Derailment Manual, UP claims that document "outlines the role and playbook of Union Pacific's Public Relations Department" and "contains investigative techniques for derailments caused by suspected vandalism or sabotage, including explanations on how certain acts of vandalism/sabotage will cause a train to derail." (Filing No. 40 at CM/ECF p. 9). UP claims that the manual is proprietary because the procedures outlined therein provide UP with "a

6

competitive advantage in the freight industry" when it comes to investigating and preventing derailments. (Filing No. 40 at CM/ECF p. 9). Moreover, the manual includes a detailed listing of "methods of sabotage" that any individual with "common household tools" could attempt to replicate if privy to the knowledge that such a sabotage was possible. (Filing No. 40 at CM/ECF pp. 9-10).[3]

UP has identified specific concerns that demonstrate a specific risk of harm should this information be disclosed outside the confines of this lawsuit. UP has sufficiently demonstrated a good cause basis for entering the protective order it requests.

The court must therefore consider "the relative hardship to the non-moving party should the protective order be granted." General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1212 (8th Cir.1973) (citing United States v. Kordel, 397 U.S. 1, 4–5 (1970)). "The balance of relative hardships includes an assessment of any substantial detriment to a party caused by the inclusion or failure to include the protection at issue." Blair v. City of Omaha, 2011 WL 148120, at *2 (D. Neb. Jan. 18, 2011) (citation omitted). Protective orders are intended to "expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect confidential material, and ensure that protection is afforded only to material so entitled...[.]" United States ex rel. Brown v. Celgene Corp., 2016 WL 6542729, at *3 (C.D. Cal. Mar. 14, 2016) (citation omitted).

---

[3] When considering pending motions, a court may take judicial notice of its filings. Those filings substantiate UP's concerns regarding the potential harm of disseminating video evidence depicting the layout and operations within its yard facilities. See, e.g., USA v. Love, 8:21-cr-00054-BCB-SMB (D. Neb. 2021). This court's criminal filings also substantiate the railroad's concern with dissemination of video recordings depicting how a moving train is operated, how onboard personnel respond to emergencies, and how nefarious actors could hijack and potentially derail a train, thereby causing substantial harm to the train crew, passengers, property, and depending on its cargo and the location of the derailment, perhaps whole communities. See, e.g., USA v. Wilson, 4:18-cr-03005-JMG-CRZ (D. Neb. 2018).

The court cannot identify any prejudice or "substantial detriment" to Plaintiff if the court enters UP's proposed protective order. That order would afford Plaintiff full access to the videos and the Derailment Manual, and it does not hamper in any way his use of that information to prove his case. Plaintiff's counsel may believe he will be prejudiced by being unable to more widely use the videos and Derailment Manual. But the question presented before me is whether the plaintiff in this lawsuit, not his Plaintiff's counsel and his future clients, will be prejudiced.[4] Aside from concern that he may be sanctioned if he disobeys the protective order, Plaintiff has not explained any prejudice he will experience if UP's requested protective order is entered.

Plaintiff (or Plaintiff's counsel) appears to seek ongoing access to the disputed discovery for a purpose broader than this litigation. While that is not inherently improper under the rules, it is contrary to spirit and purpose of the discovery process. On balance, the good cause demonstrated by UP outweighs the prejudice, if any, to the plaintiff herein if UP's requested protective order is entered. Given the principles and the analysis above, the court will compel production of the videos and Derailment Manual subject to the protective order terms proposed by UP.

II. Witness Statements

UP took the recorded statements of Chris Johnson ("Johnson") and Darin Wolfrum ("Wolfrum") on January 9, 2019 – approximately ten days after the subject accident occurred. Both statements were taken by now-deceased UP employee

---

[4] Plaintiff's counsel argues in its reply that: "Plaintiff should not be subjected, as defendant suggests, to relitigate the retrieval of the relevant evidence at issue in all other matters it has with Defendant." (Filing No. 46 at CM/ECF p. 7). There is no argument or evidence indicating that Plaintiff Hague has any other litigation with this or any other railroad defendant. The concern outlined in the briefing, then, appears to be Plaintiff's counsel being "subjected" to relitigation of this issue. Plaintiff's counsel's concern regarding his representation of clients in future litigation is not Plaintiff's (or the court's) concern in this case.

8

Mary Broad ("Broad"), who then served as "Senior Risk Manager" in UP's risk management department. Johnson, a third-party van driver, was near the scene of the subject accident and was the first to report the derailment. Wolfrum, a UP employee who serves as an "Extra Gang Foreman," was present at the scene and participated in the investigation of the derailment. (Filing No. 40 at CM/ECF p. 2).

In response to a discovery request from Plaintiff, UP produced a privilege log which indicated that it was withholding the Johnson and Wolfrum statements pursuant to the work-product doctrine and attorney-client privilege. (Filing No. 35-6 at CM/ECF p. 1). Plaintiff disagreed with UP's characterization of the statements and demanded that UP withdraw its privilege claims and produce the statements. (Filing No. 33 at CM/ECF p. 4). Although UP does not now claim that the statements are protected from disclosure under the attorney-client privilege,[5] UP maintains are work-product and are therefore not subject to discovery.

The parties could not reach an amicable resolution to the work-product dispute and Plaintiff, on the instant motion, seeks an order compelling UP to produce them.

With respect to the work-product protection, Fed. R. Civ. P. 26(b)(3)(A) provides: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representatives (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." To determine whether a document was prepared in anticipation of litigation, the court must consider whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of

---

[5] The court agrees. Given the circumstances, and being fully advised, the court finds that the statements are not subject to the attorney-client privilege.

9

litigation." Simon v. G. D. Searle & Co., 816 F.2d 397, 401 (8th Cir. 1987). But "there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation." Simon, 816 F.2d at 401.

Plaintiff argues that UP took these statements in the ordinary course of business. Plaintiff claims that "[a]s a matter of course, UP investigates the facts of incidents resulting in personal injuries to determine their root causes" and that Broad took the statement "in the course of her normal duties." (Filing No. 46 at CM/ECF p. 3). Plaintiff claims that UP was required to report the derailment and resultant injury to the Federal Railroad Administration ("FRA") and that the statements taken were therefore required under UP's normal processes as part of its obligation to the FRA. UP counters, however, that the FRA investigation was separate and apart from the investigative work undertaken by Broad and the risk management department. UP argues that FRA reporting and investigation is handled by a different department, that no FRA employee was present for the Johnson and Wolfrum interviews, and that the statements taken by Broad were never provided to the FRA.[6] The court addressed analogous facts in Ellenbecker v. BNSF Ry. Co., 2019 WL 6771827 (D. Neb. Dec. 11, 2019). In Ellenbecker, the plaintiff argued that certain statements should be considered part of the FRA investigation and were therefore not work-product. The railroad defendant argued that the statements in question were taken by a different department, were not associated with the FRA reporting requirements, and were not taken in the ordinary course of business. Id.

The court agreed with the railroad in Ellenbecker and does so again here. Based on the record before the court, the statements were not a part of the normal

---

[6] In Plaintiff's opening brief, he argues that an FRA employee was present for the disputed interviews. UP, in its response and attached evidence, claims that is untrue. Plaintiff does not contest UP's claim that no FRA employee was present for the interviews in its reply. It appears, then, after review of the full record, that UP's claim that no FRA employee was present is not now in dispute.

FRA reporting requirements but were taken as part of a separate investigative process. Moreover, based on the evidence of record, UP immediately retained counsel related to this incident and involved their counsel in Broad's investigation. ([Filing No. 40 at CM/ECF p. 3](#)). Prior to Broad's interviews with Johnson and Wolfrum, Broad spoke with UP's retained counsel about the incident and she obtained the statements at counsel's direction. ([Filing No. 40 at CM/ECF p. 3](#)).

Given the foregoing, the court finds that UP, as the proponent of the work-product privilege, has sufficiently established that the Johnson and Wolfrum statements were work-product made in anticipation of litigation and should therefore be protected from disclosure in discovery. Plaintiff has not shown a "substantial need for the materials to prepare [his] case" and that he "cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). Plaintiffs' motion to compel a copy of the statements will be denied.

Accordingly, IT IS ORDERED that Plaintiff's motion to compel ([Filing No. 33](#)) is granted in part and denied in part as outlined herein.

1) Plaintiff's motion to compel production of the January 9, 2019 statements of Chris Johnson and Darin Wolfrum is denied.

2) On or before July 1, 2021, UP must produce the disputed video footage and the Derailment Manual under the following terms:

    a. The Derailment Manual and video from any locomotive camera concerning the subject accident shall not be disclosed, produced, or otherwise disseminated to anyone who is not involved in this case by Plaintiff, as well as any agents or representatives of the Plaintiff.

    b. The Plaintiff, as well as any agents or representatives of the Plaintiff, shall not allow the subject items to be disseminated on the

Internet or any other electronic media, and no party shall use these items in advertisements.

c.     The Plaintiff, as well as any agents or representatives of the Plaintiff, will ensure that if the subject items are given to any employee of theirs or any outside expert, that these individuals will be advised of and provided a copy of this Protective Order and they shall not disseminate the subject items on or to the Internet or any other outside electronic media nor shall they disclose, produce, or otherwise disseminate it to anyone who is not involved in this case.

d.     Any employee of or outside expert utilized by the Plaintiff, as well as any agents or representatives of the Plaintiff, who accepts access to the subject items or copies of the same shall be bound by the usage restrictions outlined in this Protective Order.  Plaintiff shall, prior to granting third-party access to the subject items, provide such recipients with a copy of this Protective Order, and require that any recipient affirmatively agree, in writing, to be bound by its terms.

e.     The items may not be used for any purpose other than in connection with the preparation for, and trial of, this litigation.

f.     That the termination of proceedings in this action shall not relieve any person to whom the items have been disclosed from the obligations of this Protective Order and said items will be destroyed/deleted or returned to UP at the conclusion of this case.

Dated this 10th day of June, 2021.

                              BY THE COURT:

                              *s/ Cheryl R. Zwart*
                              United States Magistrate Judge